UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| BETH  BREITWEISER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:15-cv-01687-TWP-MJD |
| | ) | |
| INDIANA DEPARTMENT OF CHILD | ) | |
| SERVICES, | ) | |
| MARY BETH BONEVENTURA, | ) | |
| PEGGY  SURBEY, | ) | |
| NOLA  HUNT, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

Presently pending before the Court is Defendants' Motion for Judgment on the Pleadings.

[Dkt. 47.]  Defendants seek judgment on Plaintiff Beth Breitweiser's Amended Complaint,

which alleges that Defendants wrongfully investigated Plaintiff for child abuse or neglect.  [Dkt.

42.]  For the following reasons, the Magistrate Judge recommends that the District Judge

**GRANT IN PART** and **DENY IN PART** Defendants' Motion.

**I.  Standard of Review**

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment after the close

of the pleadings.  Under Rule 12(c), the Court may consider only the pleadings.  *N. Indiana Gun*

*& Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998).  "The pleadings

include the complaint, the answer, and any written instruments attached as exhibits."  *Id.*  If a

conflict exists between the allegations in the complaint or the answer and any attached exhibit,

then "the exhibit trumps the allegations."  *Id.* at 454.  "A defendant may use a rule 12(c) motion

after the close of the pleadings to raise various rule 12(b) defenses regarding procedural defects, in which case courts apply the same standard applicable to the corresponding 12(b) motion." *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993). As with a Rule 12(b) motion, the Court assumes the truth of all well-pleaded allegations and draws all reasonable inferences "in the light most favorable" to the plaintiff. *Id.*

## II.  Background

### A.  Breitweiser's Initial Encounter with DCS

Breitweiser is a mother of two minor children and a licensed veterinarian. [Dkt. 42 at 3 (¶¶ 7-8).] Sometime before January 16, 2015, Breitweiser moved her family into an apartment in the basement of her veterinary clinic ("Clinic") while her primary home underwent renovation. [Dkt. 42 at 3-4 (¶¶ 17).] On January 16, 2015, a report was filed with the Indiana Department of Child Services (DCS) stating that Breitweiser had engaged in child abuse or neglect. [Dkt. 42 at 4 (¶ 20).] Without any further investigation into the report, Family Case Manager Nola Hunt, accompanied by another case manager (collectively, the "DCS agents"), visited the Clinic unannounced and in plain clothes. [Dkt. 42 at 4-5 (¶ 22).] Amanda Smith, who was working at the Clinic reception desk, greeted the DCS agents and inquired of their identity and purpose. [Dkt. 42 at 5 (¶¶ 23, 25-26).] Breitweiser, who was in her private office, could hear the goings-on in the Clinic lobby, and additionally requested the DCS agents to identify themselves, which request Hunt was able to hear from the lobby. [*Id.* (¶ 27).] Rather than answer Smith's questions, the DCS agents demanded to interrogate Breitweiser, refused to identify themselves or their purpose, and refused to show any identification. [*Id.* (¶¶ 25-27).] Breitweiser feared for her family's safety and left, taking her mother and children through the rear door of the Clinic. [*Id.* (¶ 28).] The DCS agents stepped outside and tried unsuccessfully to block Breitweiser's car

from leaving the Clinic driveway.  [*Id.* (¶¶ 29, 47).]  The DCS agents saw Breitweiser's children

in the back seat of Breitweiser's car as she drove away.  [*Id.*]

 After seeing Breitweiser and her children depart, the DCS agents returned to the Clinic,

called the Indianapolis Metropolitan Police Department (IMPD) to request an officer, and

demanded to inspect the premises.  [Dkt. 42 at 5-6 (¶¶ 31, 35).]  Breitweiser's attorney called

the Clinic and asked to speak to Hunt to find out who she was and why she had come to the

Clinic.  [Dkt. 42 at 6 (¶ 36).]  Hunt refused to speak with the attorney, though the IMPD officer

spoke with the attorney and was informed that the DCS agents were not permitted to enter or

inspect the Clinic.  [*Id.* (¶¶ 37, 39).]  The officer told the attorney that the officer had come to

maintain the peace and not to assist with the DCS agents' investigation.  [*Id.* (¶ 38).]  Hunt

eventually identified herself as a DCS agent but was still specifically denied permission to enter

or inspect the Clinic.  [*Id.* (¶¶ 40, 42, 44).]  Despite lacking permission, a warrant, or any other

order permitting her to do so—and despite knowing that there was no emergency since

Breitweiser's children were no longer at the Clinic—Hunt entered the Clinic and attached

apartment and took photographs.  [Dkt. 42 at 6-7 (¶¶ 41-47).]

 Hunt left the Clinic and went to Breitweiser's primary home, where she posted a notice

stating "Your child(ren) have been taken into custody" and stating that court proceedings had

been initiated.  [Dkt. 1-1; Dkt. 42 at 7 (¶ 49).]  Breitweiser's children in fact had not been taken

into custody and remained with Breitweiser.  [Dkt. 42 at 7 (¶ 51).]  Breitweiser's attorney

contacted the juvenile court on the days following the events of January 16 and was informed

that no such court proceeding had been initiated.  [Dkt. 42 at 7-8 (¶¶ 53-58).]  Breitweiser was

notified on January 20 that proceedings would begin the following day.  [Dkt. 42 at 8 (¶ 59).]

### B. DCS Investigation and Juvenile Court Proceedings

On January 27, 2015—after inspecting the Clinic apartment and informing the juvenile court that the apartment was in safe and acceptable condition—DCS initiated Children in Need of Services (CHINS) proceedings. [Dkt. 1-3; Dkt. 34-1 at 3-5; Dkt. 42 at 9 (¶¶ 57-69).] Thereafter, DCS interviewed Breitweiser's children and conducted further investigation while CHINS proceedings continued. [Dkt. 42 at 8-12 (¶¶ 72-110).] The investigation, which included numerous home inspections and guardian ad litem interviews with character witnesses, revealed no evidence of any abuse or neglect. [*See id.*] Meanwhile, DCS continually insisted that Breitweiser relinquish custody of her children and that Breitweiser undergo mental health exams. [Dkt. 42 at 18 (¶¶ 161-63).] Breitweiser persistently demanded that DCS dismiss the CHINS proceedings and demanded evidentiary hearings, pointing to the lack of evidence of wrongdoing and the consistent findings that her children received appropriate care. [*See* Dkt. 1-2; Dkt. 1-4; Dkt. 1-5; Dkt. 1-6; Dkt. 34-1 at 1-2, 6-15; Dkt. 42 at 8-12, 19 (¶¶ 72-110, 169).] On February 24, 2015, Hunt admitted at a deposition that at least part of her report was inaccurate and false. [Dkt. 42 at 12 (¶¶ 105-06).]

Despite the paucity of any evidence suggesting child abuse or neglect, DCS repeatedly declined to dismiss the CHINS petition until March 16, 2015, the day prior to the evidentiary hearing scheduled in the matter. [Dkt. 42 at 8-13 (¶¶ 72-116).] Breitweiser served the State of Indiana with a Notice of Tort Claim on March 27, 2015. [Dkt. 42 at 14 (¶ 118).] On May 20, 2016, DCS issued a "Notice of Assessment Outcome and Right to Request Administrative Review" concluding that the charges against Breitweiser were "**SUBSTANTIATED**." [Dkt. 1-7 at 1 (emphasis in original); Dkt. 34-1 at 19; Dkt. 42 at 14 (¶ 119).] This caused Breitweiser to be placed on the Child Protection Index, which is a list of all persons in Indiana who have

committed substantiated acts of child neglect.  [Dkt. 42 at 2 (¶ 1.E); Dkt. 42 at 14 (¶ 120).]  On

June 4, 2015, Breitweiser petitioned for administrative review of the DCS's decision.  [Dkt. 1-8;

Dkt. 34-1 at 21-41; Dkt. 42 at 14 (¶ 121).]  On June 12, 2015, the DCS reversed itself,

concluding that the charges against Breitweiser were "**UNSUBSTANTIATED**" and removing

Breitweiser from the Child Protection Index.  [Dkt. 1-9 at 1; Dkt. 34-1 at 42; Dkt. 42 at 14 (¶

122).]  Throughout the entire investigation and juvenile court proceedings, Peggy Surbey,

director of the Marion County DCS office, and Mary Beth Bonaventura, DCS director (the "DCS

Directors"), knew about, supervised, and consented to Hunt's actions.  [Dkt. 42 at 4, 14, 17, 19,

20 (¶¶14-16, 124, 145, 165, 181).]  On October 23, 2015, Breitweiser brought suit in this Court.

[Dkt. 1.]

### C.  Procedural History

Breitweiser's October 2015 Complaint named four defendants: DCS, Hunt, Bonaventura

in her official capacity, and Surbey in her official capacity.  [Dkt. 1 at 1.]  The complaint alleged

constitutional claims pursuant to 42 U.S.C. § 1983 and common law and statutory state law

claims.  [*Id.*]  On December 14, 2015, the defendants filed a motion to dismiss for failure to state

a claim, arguing in part that the individual defendants could not be sued in their official capacity

under § 1983.  [Dkt. 11.]

On February 22, 2016, in response to Defendants' motion to dismiss, Breitweiser filed a

motion for leave to amend her complaint [Dkt. 36], which the Court granted on March 9, 2016

[Dkt. 41].  Breitweiser's currently-operative Amended Complaint names as defendants Hunt,

Bonaventura, and Surbey, in their individual capacities (the "Individual Defendants"), along with

DCS.  [Dkt. 42 at 1.]  The Amended Complaint lists four counts: violations of the Fourth

Amendment under § 1983 ("Count I") [Dkt. 42 at 16-17 (¶¶ 137-52)], violations of Fourteenth

Amendment due process rights under § 1983 ("Count II") [Dkt. 42 at 18-19 (¶¶ 153-70)],

trespass under state law ("Count III") [Dkt. 42 at 19-21 (¶¶ 171-87)], and intentional infliction of

emotional distress under state law ("Count IV") [Dkt. 42 at 21 (¶¶ 188-94)].  On April 14, 2016,

Defendants' filed the instant Motion for Judgment on the Pleadings, seeking judgment in their

favor on all counts of the Amended Complaint.  [Dkt. 47.]

### III.  Discussion

With respect to the constitutional claims in Counts I and II, Defendants argue that

Breitweiser fails to adequately plead the DCS Directors' personal involvement.  Defendants

further argue that all three Individual Defendants are entitled to qualified immunity as to both

constitutional claims.

With respect to the state law claims in Counts III and IV, Defendants argue that all three

Individual Defendants are entitled to statutory immunity under Indiana Code section 31-25-2-

2.5.  Defendants argue that the DCS Directors are additionally entitled to immunity under

Indiana Code section 34-13-3-5 of the Indiana Tort Claims Act.

The Court first addresses several matters that the parties' briefs make clear are no longer

in dispute.  Then, the Court will address each of Defendants' contested arguments in turn.

### A.  Uncontested Matters

In her response brief to Defendants' Motion, Breitweiser clarified the following:

- Breitweiser withdraws her claims against DCS;

- Breitweiser is making no claim under the Indiana Constitution;

- Breitweiser is only alleging claims against the Individual Defendants in their individual

  capacities;

- Breitweiser does not allege state-law claims as a result of Defendants' participation in any judicial proceeding.

[Dkt. 57 at 2, 18.]  Accordingly, the Court should **GRANT** Defendants' Motion as to (a) all claims against DCS; (b) Counts I and II insofar as they seek relief under the Indiana Constitution [*e.g.*, Dkt. 42 at 17 (¶ 147)]; (c) all claims to the extent they seek relief from the Individual Defendants in their official capacities; and (d) Counts III and IV to the extent they allege claims based upon Defendants' participation in judicial proceedings.

## B.  Supervisors' Involvement

Defendants argue that Counts I and II must be dismissed as to the DCS Directors for failure to sufficiently allege their participation in unconstitutional conduct as required by § 1983. They argue that, as pleaded, Breitweiser's claims against the DCS Directors amount only to claims of vicarious liability.  In response, Breitweiser argues that her allegations that the DCS Directors supervised and approved Hunt's conduct are sufficient to state a § 1983 claim.  In reply, Defendants argue that Breitweiser's allegations are wholly conclusory and without factual support.

Because Defendants have raised a failure to state a claim defense, the Court must assess the operative complaint under Federal Rule of Civil Procedure 8, which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The Court takes all well-pleaded allegations as true and draws all reasonable inferences in favor of the non-movant, *Hayes*, 670 F.3d at 813, "but legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to this presumption of truth," *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).  After thus "excising" such conclusory allegations, *McCauley*, 671 F.3d at 616, the Court

will grant judgment in the defendants' favor if the plaintiff's complaint does not "state a claim to relief that is plausible on its face," *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   A complaint meets this standard where it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

42 U.S.C. § 1983 provides that a "person" who "subjects, or causes [another person] to be subjected" to the deprivation of a constitutional right "shall be liable to the party injured." The terms "subjects" and "causes to be subjected" limit the applicability of § 1983 to defendants who are "personally responsible for the deprivation of the right at the root" of a plaintiff's claim. *Backes v. Vill. Of Peoria Heights*, 662 F.3d 866, 869 (7th Cir. 2011) (internal quotation omitted). This does not mean, however, that a defendant must be a "direct" participant in the constitutional deprivation. *Id.* at 869-70.   Rather, "a supervisor may still be personally liable for the acts of his subordinates if he 'approves of the conduct and the basis for it.' . . . 'They must in other words act either knowingly or with deliberate, reckless indifference.'" *Id.* at 870 (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)).   At the pleading stage, this requires plausible factual allegations that the supervisors "personally caused, participated in, or had a reasonable chance to stop" the unconstitutional conduct.   *Golden v. Stutleen*, 535 F. App'x 526, 528 (7th Cir. 2013) (citing *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007)).

Under the Seventh Circuit's interpretation of Rule 8 pleading standards, a plaintiff must allege more than just the elements of § 1983 liability.   *See, e.g.*, *McCauley*, 671 F.3d at 618.   In *McCauley*, for example, the plaintiff sought to establish an equal-protection claim under § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).   Such a claim required the

plaintiff to plead sufficient facts "to draw the reasonable inference that the City established a policy or practice of intentionally discriminating against female victims of domestic violence in the provision of police protection." *McCauley*, 671 F.3d at 618.  In part, the plaintiff alleged that the defendant city "authorized, tolerated, and institutionalized the practices and ratified the illegal conduct herein detailed." *Id.* at 617.  The court concluded that the plaintiff's allegations merely recited "the legal elements of the various claims McCauley has asserted; they are not factual allegations and as such contribute nothing to the plausibility analysis." *Id.* at 618.  The dissent observed that "McCauley made factual allegations that Chicago police failed to arrest Martinez despite knowledge of his harassment and violations, and that this failure resulted from a custom of untimeliness and indifference with regard to the seriousness of domestic violence." *Id.* at 629 (internal citations omitted) (Hamilton, J., dissenting).  Furthermore, while the plaintiff alleged "'deliberate indifference' generally, [she] elsewhere describes numerous specific failures to act that are factually consistent with such an intent." *Id.* (internal citation omitted).  While these additional facts would have been sufficient for the dissent to reverse the dismissal, they did not convince the majority that the plaintiff had "'nudg[ed]' his claim of purposeful discrimination 'across the line from conceivable to plausible.'" *Id.* at 618 (majority opinion) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 683 (2009) (refusing, in same context, to give the presumption of truth to allegations that defendants "knew of, condoned, and willfully and maliciously agreed to subject" the plaintiff "to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest'" (alteration in original))).

Breitweiser's allegations specifically with respect to the DCS Directors are, in their entirety, as follows:

9

- 14. Defendant Bonaventura was at all times relevant hereto Director of DCS and a resident of the State of Indiana.

- 15. Defendant Surbey was at all times relevant hereto Director of the Marion County office of DCS and a resident of the State of Indiana.

- 16. . . . Surbey is the supervisor of Hunt.

- 124. Defendants Bonventura and Surbey supervised and approved the unlawful conduct of Defendant Hunt.

- 145. Defendant Hunt's conduct was supervised and approved by Defendant Bonaventura and Defendant Surbey.

- 165. Defendant Hunt's conduct was undertaken with the knowledge, supervision, and consent of Defendant Bonaventura and Defendant Surbey.

- 181. Defendant Hunt's conduct was supervised and approved by Defendant Bonaventura and Defendant Surbey.[1]

[Dkt. 42 at 4, 14, 17, 19, 20 (¶¶14-16, 124, 145, 165, 181).]  In support of the legal sufficiency of these allegations, Breitweiser relies principally on two cases, *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000) and *Estate of Allen ex rel. Wrightsman v. CCA of Tennessee, LLC*, No. 1:08-cv-0774-SEB-TAB, 2009 WL 2091002 (S.D. Ind. July 14, 2009), which cases Defendants in turn attempt to distinguish.  Neither case is persuasive.

---

[1] Breitweiser's allegations targeted at all defendants perhaps could have aided her argument regarding the sufficiency of her complaint, [*see, e.g.*, Dkt. 42 at 15 (¶ 30) ("[All] Defendants repeatedly pressured Breitweiser to surrender M.B. and T.B. and submit to invasive mental health exams without any legal basis.")], but Breitweiser does not cite to such allegations and instead rests on her allegations "that Bonaventura and Surbey **supervised and approved** the unlawful conduct of Hunt," [Dkt. 57 at 9 (emphasis original)].  Any argument that the allegations against "all defendants" were sufficient to satisfy Rule 8 as to the DCS Directors is therefore waived.

As an initial matter, *Brokaw* is a pre-*Twombly*/*Iqbal* case and therefore could not have taken into account how those cases have impacted supervisory liability and the pleading landscape. *Cf. Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015) (observing that *Iqbal* "shaped the law of supervisory liability for constitutional violations"). But an even more fundamental difference is that *Brokaw* involved allegations that the supervisor "**directed those who removed the children to do so.**" 235 F.3d at 1014 (emphasis added). These are allegations of supervisor involvement that are conspicuously absent in this case. The inapplicability of *Brokaw* to this case is buttressed by an analysis of the cases upon which *Brokaw* relies. These include *Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857, 859 (7th Cir. 1999), where the plaintiff alleged that the supervisor "personally directed" an unconstitutional search, and *Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir. 1999), where the plaintiff alleged that the supervisor "set in motion" the actions infringing upon the plaintiff's constitutional rights. Breitweiser's allegations of supervision, consent, and approval neither meet the post-*Iqbal McCauley* standard nor do they measure up to the allegations held sufficient in the pre-*Iqbal Brokaw* case.

*Estate of Allen*, on the other hand, is a post-*Iqbal* opinion finding the complaint at issue to be sufficient. That opinion, however, was a report and recommendation, the objections to which were sustained in their entirety by the district judge. Order Sustaining Objection, *Estate of Allen*, No. 1:08-cv-0774-SEB-TAB, Dkt. 60 (Sept. 3, 2009). Accordingly, *Estate of Allen* also has no persuasive value.

Breitweiser's allegations do no more than parrot the legal standards for holding a supervisor liable under § 1983 and, in fact, contain substantially less factual support than did the complaint found insufficient by the Seventh Circuit in *McCauley*. As such, Breitweiser's Amended Complaint lacks the required facial plausibility demonstrating that the DCS Directors

may be held personally responsible for the alleged constitutional injuries.  *See also, e.g.*, *Hurt v. Vantlin*, No. 3:14-cv-00092-JMS-WGH, 2015 WL 5837615, at *7 (S.D. Ind. Oct. 6, 2015) ("While Plaintiffs generally allege that Sergeant Blanton and Lieutenant DeYoung knew about, facilitated, and condoned a pattern and practice of misconduct that deprived Plaintiffs of their rights, legally conclusory allegations are insufficient to survive the motion to dismiss." (internal citations omitted)).  Therefore, the Court should **GRANT** Defendants' Motion and dismiss Counts I and II as to the DCS Directors with prejudice.[2]

### C.  Qualified Immunity

Defendants next argue that the Individual Defendants are entitled to qualified immunity on Counts I and II, stating that the constitutional rights allegedly violated were not clearly established at the time of Defendants' conduct.  In response, Breitweiser directs the Court to several cases that she contends demonstrate the clear establishment of the constitutional rights at issue.  In reply, Defendants argue that the cases to which Breitweiser cites are insufficient to meet her burden and that Breitweiser's complaint fails to allege that Defendants "knowingly violated the law" during their investigation.  [Dkt. 59 at 4.]

"Government officials performing discretionary functions are entitled to qualified immunity from suit 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'"  *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 352 (7th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).  Whether defendants

---

[2] Where a defendant succeeds on a Rule 12(b)(6) defense raised in a Rule 12(c) motion, dismissing the relevant claim is the appropriate result.  *See, e.g.*, *Foster v. W-Transfer, Inc.*, No. 4:11-CV-118-SEB-WGH, 2012 WL 2376188, at *5 (S.D. Ind. June 22, 2012) (dismissing claims in an order on a motion for judgment on the pleadings).  In this case, given that Breitweiser has already had one opportunity to amend her complaint in response to a motion to dismiss, the Court should exercise its discretion to dismiss Counts I and II as to the DCS Directors with prejudice.

are entitled to qualified immunity is properly "resolved at the earliest stages of litigation." *Id.*

"[O]nce the defense is raised, it becomes the plaintiff's burden to defeat it." *Jewett v. Anders*,

*521 F.3d 818, 823 (7th Cir. 2008).*

To deny defendants' claim to qualified immunity at the pleading stage, "(1) 'the

complaint must adequately allege facts that, if true, would constitute a violation of a

constitutional right,' and (2) 'the case law must be 'clearly established' at the time of the alleged

violation, so that a reasonable public official would have know[n] that his conduct was

unlawful.'" *Kiddy-Brown*, 408 F.3d at 353 (quoting *Delgado v. Jones*, 282 F.3d 511, 515 (7th

Cir. 2002)). The Court, in its "sound discretion," may decide "which of the two prongs of the

qualified immunity analysis should be addressed first in light of the circumstances of the

particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Satisfying the second prong generally requires the plaintiff to "point to closely

analogous" precedential authority "decided prior to the defendants' challenged actions." *Upton

v. Thompson*, 930 F.2d 1209, 1212 (7th Cir. 1991) (internal quotation omitted); *Anderson v.

Romero*, 72 F.3d 518, 525 (7th Cir. 1995) ("[D]istrict court decisions cannot *clearly* establish a

constitutional right."). This showing does not "require a plaintiff to produce a case that is

'directly on point' in order to show that a right is clearly established." *Kiddy-Brown*, 408 F.3d at

356 (quoting *Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996)). Moreover, "[a] plaintiff

can defeat qualified immunity by showing 'that the violation was so clear that a government

official would have known that his actions violated the plaintiff's rights even in the absence of a

factually similar case.'" *Lessley v. City of Madison*, 654 F. Supp. 2d 877, 901 (S.D. Ind. 2009)

(Hamilton, C.J.) (quoting *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008)).

The parties in their briefing offer an intermingled treatment of the qualified immunity issues in this case. However, Breitweiser alleges two distinct constitutional injuries in Counts I and II that require two distinct analyses. The Court thus addresses the availability of qualified immunity for each alleged constitutional violation separately.

### 1. Warrantless Search

Defendants argue that Breitweiser cannot demonstrate that "no reasonably competent DCS worker would have believed that she had the authority to enter Plaintiff's hybrid business/home based upon all of the information she received." [Dkt. 48 at 10.] Defendants argue that Defendant Hunt was acting pursuant to her statutory obligations and that, had she not entered the Clinic apartment, "it would have given Plaintiff opportunity to change the existing condition of the Clinic" before she could complete her investigation. [Dkt. 48 at 11.] Defendants contend that there is no "clearly established law that told Defendant Hunt just how to deal with an allegation that the condition of a business/home is to be handled [sic] when the owner has left the business." [Id.]

In response, Breitweiser cites to Fourth Amendment case law establishing the applicability of the warrant requirement to administrative searches. Breitweiser in particular points to *Doe v. Heck*, 327 F.3d 492 (7th Cir. 2003) and *Finnegan v. Myers*, No. 3:08-CV-503, 2013 WL 3816691 (N.D. Ind. June 5, 2013) as cases clearly establishing the need for DCS agents to have a warrant before searching a home.

In reply, Defendants argue that the cases identified by Breitweiser are insufficiently analogous because they do not "reasonably contour the situation similar to the case at hand which involves a serious report of abuse or neglect, a hybrid housing/veterinary office, where a parent or guardian flees the scene and refuses to cooperate with an investigation, etc." [Dkt. 59

14

at 5.]  As to this issue, the Court departs from the usual order of qualified immunity analysis

because Defendants direct almost all of their argument to the second "clearly established" prong

of the qualified immunity test.

The Fourth Amendment is incorporated against the states by the Fourteenth Amendment,

and "[t]he touchstone of the Fourth Amendment inquiry is reasonableness." *Narducci v. Moore*,

572 F.3d 313, 319 (7th Cir. 2009) (quoting *Green v. Butler*, 420 F.3d 689, 694 (7th Cir. 2005)).

The Fourth Amendment's "prohibition against unreasonable searches and seizures protects

against warrantless intrusions during civil as well as criminal investigations by the government."

*Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003) (citing *Marshall v. Barlow's, Inc.*, 436 U.S. 307,

312 (1978)).  The body of law defining the "strictures of the Fourth Amendment" therefore

applies to child welfare workers, just as it does to "all other governmental employees." *Id.*  And

"it is 'a basic principle of Fourth Amendment law that searches and seizures inside a home

without a warrant are presumptively unreasonable.'" *Hawkins v. Mitchell*, 756 F.3d 983, 991

(7th Cir. 2014) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation

omitted)).  Moreover, the Seventh Circuit in its 2003 decision in *Doe v. Heck* made it "**clear that**

**it is patently unconstitutional** for governmental officials"—specifically, in that case,

caseworkers from the county bureau of child welfare—"to **search** the premises of a private or

parochial school and/**or** seize a child attending that school **without a warrant or court order**,

probable cause, consent, or exigent circumstances." 327 F.3d at 517 (emphasis added).[3]

---

[3] Given the Seventh Circuit's unequivocal language quoted above, the Court rejects Defendants'
inaccurate and unsupportable assertion that the only thing the court determined in *Doe v. Heck* was that
"(1) seizure of children (2) without a warrant, (3) from school was not a violation of clearly established
rights at the time of the incident." [Dkt. 59 at 5.]  A "search" of a school "without a warrant" was
determined to be "patently unconstitutional." *Doe v. Heck*, 327 F.3d at 517.  Qualified immunity was
warranted only because there was a statute in place (held unconstitutional by the court as applied to the
particular plaintiffs) authorizing the defendants' actions.  *Id.* at 516 ("We, therefore, conclude that at the
time the defendant caseworkers conducted their search . . . a 'reasonable' Bureau caseworker would not

*Doe v. Heck* involved a child welfare investigation, much like the instant case. The caseworker searched a private school, seeking to interview the child as part of the investigation, but did so without consent or a court order. *Id.* The court held that it was unconstitutional for a caseworker to "search" a private school without a court order. *Id.* The sanctity of the home stands at the "very core" of the Fourth Amendment, *Hawkins*, 756 F.3d at 991 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)), and is subject to an even greater privacy interest than the private school at issue in *Heck*, *see, e.g.*, *Payton*, 445 U.S. at 585 ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (internal quotation omitted)). Breitweiser's constitutional right to have her home be free from a warrantless search by a DCS caseworker where the caseworker knew there could be no immediate danger to the children was therefore clearly established long before Defendant Hunt searched Breitweiser's home without a court order in January 2015. Defendants are correct that *Heck* involved additional conduct not at issue in this case, but Breitweiser cites to *Heck* for its holdings that **are** at issue in this case—to wit, the Seventh Circuit's discussion of the Fourth Amendment limitations on a caseworker's ability to search private premises without a warrant or court order. That particular holding is on point, unambiguous, and sufficient to put a "reasonable public official" in Hunt's shoes on notice that her "conduct was unlawful." *Kiddy-Brown*, 408 F.3d at 353 (quoting *Delgado*, 282 F.3d at 516).

Defendants argue, however, that Hunt "was attempting to carry out her statutory duties" and "was acting within [her] statutory authority." [Dkt. 48 at 10.] In support, Defendants cite to several provisions of the Indiana Code that they contend impose duties upon Hunt, which include

---

have understood his actions, vis-á-vis [the Wisconsin statute], to be unconstitutional under the Fourth Amendment."). The relevance of the Indiana statue to qualified immunity in this case is discussed *infra*.

"assessing possible child abuse or neglect and taking protective measures to prevent further abuse or neglect, investigating reports of abuse or neglect, exercising discretion to remove a child, and testifying in court."  [*Id.*]

If Defendants were correct that Hunt was acting within the confines of her statutory authority, she would be entitled to qualified immunity unless "a reasonable caseworker" would conclude that her actions vis-á-vis the statute were "grossly and flagrantly unconstitutional." *Heck*, 327 F.3d at 516 (internal quotations omitted).  But Defendants do not point to any Indiana statute specifically authorizing a search of a home without a court order or warrant.  *Compare id.* at 502 (addressing a Wisconsin statute that provided that caseworkers "may contact, observe or interview the child at any location without permission from the child's parent . . . if necessary to determine if the child is in need of protection or services, except that the person making the investigation may enter a child's dwelling only with permission from the child's parent . . . or after obtaining a court order").  And even if Defendants could have pointed to such a statute, *Heck* clearly establishes that, as applied to a warrantless search of a home, such statute would be unconstitutional.  *See id.* at 516-17.  Moreover, as Breitweiser points out later in her brief, Indiana Code section 31-33-8-7 (which is also among the provisions cited to by Defendants [*see* Dkt. 59 at 4 (citing Ind. Code. § 31-33-8 *et seq.*)]) provides that a DCS "assessment may include . . . [a] visit to the child's home."  Ind. Code. § 31-33-8-7(b).  If, however, "admission to the home . . . under subsection (b) cannot be obtained, the juvenile court, upon good cause shown, shall follow the [statutory] procedures" to order such admission.  *Id.* § 31-33-8-7(c).  The statute, like the Constitution, required Hunt to obtain a court order before entering the apartment.  It

suffices to say that Hunt's statutory authority did not extend to her alleged actions and, even if it did, would still not provide the qualified immunity she seeks.[4]

Defendants' remaining argument regarding the need to investigate the Clinic apartment before someone had a chance to alter its condition appears to be directed to the first prong of the qualified immunity test—namely, whether the conduct as alleged violated a constitutional right. *See Heck*, 327 F.3d at 513 (examining on first prong whether defendants' conduct fell within an exception to the Fourth Amendment warrant requirement). As explained above, the strictures of the Fourth Amendment apply to all government searches; so too do the exceptions to the warrant requirement. Insofar as the Court can discern, Defendants argue that Hunt's conduct may fall under the "destruction of evidence" exception (part of the larger "exigent circumstances" exception) to the Fourth Amendment warrant requirement. *E.g.*, *Jacobs v. City of Chicago*, 215 F.3d 758, 769-70 (7th Cir. 2000). That exception recognizes that where "[s]pecific facts" indicate that "evidence is likely to be destroyed" a government agent may be relieved from

---

[4] The Court rejects Defendants' unsupported assertion that Breitweiser must point to a case "which involves a serious report of abuse or neglect, a hybrid housing/veterinary office, where a parent or guardian flees the scene and refuses to cooperate with an investigation, etc." [Dkt. 59 at 5.] Defendants cite to Supreme Court cases cautioning, in various ways, against defining the asserted right "at a high level of generality." [*E.g.*, Dkt. 48 at 9 (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).] However, Defendants cite to no case law requiring such an impenetrably-narrow definition as the one they offer, though Defendants recognize that the critical inquiry is whether the asserted right is sufficiently clear so as to inform a reasonable caseworker that her actions violated the right. The Court agrees that "it would not suffice to say simply that the right to be free of unreasonable search and seizure was clearly understood." [Dkt. 48 at 10.] But the Court finds that the right to be free from a warrantless home search by a caseworker where the children are not in immediate harm (and subject to the other exceptions to the warrant requirement) is sufficiently narrow and, in any event, far narrower than the definition disapproved by the Supreme Court in *Plumhoff*. *Plumhoff* rejected reliance upon the constitutional test for excessive force as setting the clearly established law required to defeat qualified immunity and observed that simply referring to the test "avoids the crucial question whether the official acted reasonably in the particular circumstances." 134 S. Ct. at 2023. In this case, the Court's conclusions are based upon Seventh Circuit precedent that already applied the relevant constitutional test and concluded that the conduct, which in relevant part was less intrusive than the conduct in this case, was unconstitutional. Perhaps the most serious problem with Defendants' proposed definition is made evident by their use of "etc.," which suggests that not even Defendants could articulate the detail required to satisfy their conception of the qualified immunity standard. [*See* Dkt. 59 at 5.]

complying with the warrant requirement.  *Id.* at 770.  If this were the case, Hunt would be entitled to qualified immunity because her conduct would not have violated Breitweiser's Fourth Amendment rights.

The Court, however, is limited at this stage to consideration of the facts alleged in Breitweiser's Amended Complaint, and those allegations provide no basis for concluding that destruction of evidence was imminent at the time Hunt visited the Clinic.  *Cf. Jacobs*, 215 F.3d at 770 ("The allegations as pled in the plaintiffs' complaint give no indication that exigent circumstances existed in this case. There are as yet no facts on the record that would support a reasonable officer's conclusion that evidence of a crime was in imminent danger of being destroyed inside the plaintiffs' apartment at the time the Defendant Officers' conducted the search.").  The facts as alleged instead indicate the opposite—Hunt knew that Breitweiser, the target of the DCS investigation, had left the Clinic along with her children and therefore could not possibly have altered her apartment.  And, at the time Breitweiser left, neither Breitweiser nor anyone else at the clinic knew that the individuals who had visited the Clinic were DCS agents and so would not have even been alerted to the "need" to do so.  The Court cannot conclude based upon the pleadings that Hunt's search satisfied an exception to the warrant requirement and Defendants do not otherwise argue that Breitweiser failed to allege a constitutional violation.

The contours of the law as of January 2015, when Hunt's alleged search of Breitweiser's apartment occurred, clearly established that a caseworker was required to have a court order before searching a private residence—at least absent the availability of some exception to the Fourth Amendment warrant requirement.  Hunt is not entitled to qualified immunity on Count I.

Accordingly, the Court should **DENY** Defendants' Motion as to Count I of the Amended Complaint against Hunt.

### 2. Due Process

Defendants next argue that rights asserted in Breitweiser's Fourteenth Amendment substantive and procedural due process claims were not clearly established under the circumstances.  [Dkt. 48 at 11.]  Breitweiser argues that *Doe v. Heck*, 327 F.3d 492, 524 (7th Cir. 2003), clearly establishes the right to be free from baseless threats of child removal.  [Dkt. 95.] Defendants respond that, even if *Heck* establishes that verbal threats to remove a child without evidence of abuse may constitute a violation of the right to familial relations, Breitweiser's allegations are nonetheless outside the scope of the holding in that case.[5]  [Dkt. 96.]  Defendants argue that no other case clearly establishes the constitutional rights as alleged.

Substantive due process protects "the right to family relations," in recognition that the right "to bear and raise their children is the most fundamental of all rights."  *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1018 (7th Cir. 2000).  "[T]he constitutional right to familial integrity is not absolute" and is limited by the government's compelling interest in the protection of children. *Id.*  "In contrast to substantive due process claims, '[i]n procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest

---

[5] On October 20, 2016, the Court requested supplemental briefing from the parties on the application of qualified immunity to Breitweiser's due process claims.  [Dkt. 91]; *see Jones v. Page*, 76 F.3d 831, 850 (7th Cir. 1996) ("[The court] has an obligation to raise legal issues that the parties have overlooked or neglected.").  The parties' supplemental submissions [Dkt. 95; Dkt. 96] have greatly clarified the issues before the Court.  While Defendants initially maintained that physical removal of the children from Breitweiser's custody was required to defeat qualified immunity [*see* Dkt. 48 at 11-12], they now (appropriately) "capitulate that . . . actual removal of a child is not a prerequisite" for a familial interests claim [Dkt. 96 at 2].

without due process of law.'" *Id.* at 1020 (quoting *Doe by Nelson v. Milwaukee County*, 903 F.2d 499, 502 (7th Cir. 1990)).  Familial relations are a protected liberty interest, interference with which requires at least some modicum of process.  *See id.* ("What exactly this means is less clear, as the amount of process due varies with the particular situation—it is a 'flexible' concept.").[6]

    As both parties now recognize, the Seventh Circuit in *Doe v. Heck* clearly established that threats to remove a child from a parent's custody without any evidence of child abuse violate the Fourteenth Amendment.  327 F.3d at 524.  The challenge raised by Defendants is whether Breitweiser has fairly alleged such a threat.  As Defendants concede, qualified immunity is unavailable "if the Court infers from the Amended Complaint that Defendants were alleged to have made verbal threats to Plaintiff to remove her children while lacking evidence."  [Dkt. 96 at 5.]  Of course, at the pleadings stage, this Court is **required** to draw all "permissible" and "reasonable" inferences in the plaintiff's favor, *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015), to determine whether the plaintiff "can succeed under **any** set of facts," *Brokaw*, 235 F.3d at 1017 (emphasis added).

---

[6] As the foregoing discussion makes clear, the substantive and procedural due process analyses are distinct, though "actions toward [an individual] may simultaneously constitute a violation" of both substantive and procedural due process.  *Brokaw*, 235 F.3d at 1020 n.16.  The parties do not distinguish between the two in their submissions, and it is not the Court's task to create arguments addressed to a particular due process branch.  It is sufficient to observe that Breitweiser's Amended Complaint appears to state both procedural and substantive due process claims, though the Court's analysis above resounds primarily in the substantive realm.  *Heck*, for example, establishes procedural due process rights that are applicable to this case.  327 F.3d at 527 ("[W]e conclude that the plaintiffs have stated claims against the defendant for violating their right to procedural due process by: (1) failing to obtain a warrant or court order before searching Greendale's premises . . . and (3) investigating the plaintiff parents for child abuse and threatening to remove the Does' children from their custody without definite and articulable evidence giving rise to a reasonable suspicion that the plaintiff parents had abused their children or that the children were in imminent danger of being abused.").

The Amended Complaint includes allegations that Defendants demanded or stated that "Breitweiser's care of M.B. and T.B. was so deficient that the state should **forcibly take** M.B. and T.B. from Breitweiser's care and custody" [Dkt. 42 at 15 (¶ 125.G)] and that such statements were made while Defendants "knew of the falsity" of the allegations [*Id.* (¶ 126)]. [*See also* Dkt. 42 at 18 (¶ 161) ("Defendants repeatedly pressured Breitweiser to surrender M.B. and T.B. to the government without legal cause."); *id.* (¶ 162) ("Defendants repeatedly informed Breitweiser that they would continue with efforts to take M.B. and T.B. into custody unless Breitweiser capitulated . . . .  Defendants knew they had no basis to make such demands.").]  These allegations, when all permissible and reasonable inferences are drawn therefrom, sufficiently state that Defendants (which, at this stage, the Court may reasonably assume included Hunt) threatened to remove Breitweiser's children without any evidence.[7]

Defendants rejoin that this case is different from *Heck* in two ways: First, any threat in this case was not "communicated in absence of any evidence of child abuse." [Dkt. 96 at 3-4.] Second, any threat in this case "came after Defendant Hunt performed her investigation of Plaintiff's apartment.  The fact that the investigation had been completed distinguishes the case at hand from *Heck*." [Dkt. 96 at 4.]  Both of these differences boil down to one argument: unlike *Heck*, here Hunt had some evidence of child abuse at the time she made her alleged threats to remove Breitweiser's children.  But arriving at this conclusion requires drawing inferences in

---

[7] Defendants make much of the fact that the threats in *Heck* were "verbal" (the Court understands Defendants to actually mean "oral threats" as opposed to "written threats"; both oral and written threats would in fact be "verbal threats") while apparently maintaining that the alleged threats in this case were not.  [*E.g.* Dkt. 96 at 3 ("In the case at hand, the Amended Complaint makes no allegations that any verbal threats were issued by any Defendant to Plaintiff to remove her children.").]  This is a distinction without significance, as baseless written threats to "forcibly take" a child from a home may even be more outrageous than baseless oral threats to do so, perhaps because they may appear more official.  Even if this distinction were of some legal import, one may reasonably infer from the allegations that the threats were made orally; the Court declines to assume otherwise.

Defendants' favor instead of Breitweiser's.  If the factual allegations in the Amended Complaint are to be believed (as they must at this stage), at a minimum, Defendants knew in the immediate aftermath of receiving the report of abuse that the allegations contained therein were wholly meritless.  [*See, e.g.*, Dkt. 42 at 15 (¶ 126).]  The fact that the threat or threats came at some point after Hunt's initial investigation of the Clinic does not move the allegations beyond the scope of the rights clearly established in *Heck*.  If anything, it makes the alleged conduct even more egregious because the threats followed an investigation that made the baselessness of the child abuse allegations crystal clear.

The Seventh Circuit in *Brokaw* joined in the Fifth Circuit's observation that

[c]ases claiming governmental interference with the right of family integrity are properly analyzed by placing them, on a case by case basis, along a continuum between the state's clear interest in protecting children and a family's clear interest in privacy. When the facts of a case place it in the center of the continuum where the two interests overlap and create a tension, the right to family integrity may properly be characterized as nebulous, and thus a defendant may claim the protection of qualified immunity. However, when the facts of a case place it squarely on the end of the continuum where the state's interest is negligible and where the family privacy right is well developed in jurisprudence from this circuit and the Supreme Court, a defendant's defense of qualified immunity, based on a claim that the right to family integrity was not clearly established, will fail.

235 F.3d at 1023 (alteration in original) (quoting *Morris v. Dearborne*, 181 F.3d 657, 671 (5th Cir. 1999)).  Because this matter is before the Court solely on the pleadings, "we do not know enough facts to determine where along the continuum this case falls."  *Id.*  Breitweiser's Amended Complaint sufficiently alleges a violation of clearly established due process rights which are protected by the Fourteenth Amendment.  Qualified immunity is therefore inappropriate at this stage of the case.  The Court should therefore **DENY** Defendants' Motion as to Court II against Hunt.

**D.  State Law Claims**

Defendants seek statutory immunity as to Breitweiser's state law claims in Counts III and

IV and argue that Indiana Code section 31-25-2-2.5 immunizes the Individual Defendants from

liability because, as alleged, all of their actions occurred while they were performing their

official duties.  In response, Breitweiser argues that the statute does not apply because

Defendants failed to strictly comply with the statutory requirements for how to conduct

investigations of child abuse.  In reply, Defendants argue that Breitweiser has misstated the

applicable test for applying the statute.

Section 31-25-2-2.5 provides: "The following are not personally liable, except to the

state, for an official act done or omitted in connection with performance of duties under this title:

(1) The director of the department. (2) Other officers and employees of the department."  Ind.

Code § 31-25-2-2.5.  In *D.L. v. Huck*, the Indiana Court of Appeals explained that the statute

immunizes liability for "actions or omissions that could reasonably be seen to be within the

duties of the Department of Child Services employees."  978 N.E.2d 429, 435-36 (Ind. Ct. App.

2012).  Applying that standard, the court affirmed the dismissal of several state law claims

(except for a fraud claim)[8] stemming from allegations that the DCS removed a child without any

notice or court order and then refused to provide any opportunity to challenge the removal.  *Id.* at

431-32.

Given that the Indiana Court of Appeals has spoken unequivocally on the subject, the

Court rejects Breitweiser's proposed interpretation of section 31-25-2-2.5.  Breitweiser quotes a

plethora of legal maxims all essentially providing that immunities are to be strictly construed.

But the Court is not interpreting section 31-25-2-2.5 as a matter of first impression and so is

---

[8] The court did not elaborate on the specific allegations of fraud.

bound by the Indiana Court of Appeals' interpretation of Indiana law unless "there are persuasive indications that the highest court of the state would decide the case differently from the decision of the intermediate appellate court." *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir.). *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1937). Breitweiser has given this Court no reason to believe that the Indiana Supreme Court would differ from the interpretation of the statute set out in *Huck*.

In this case, as in *Huck*, all of Defendants' actions "could reasonably be seen to be within the duties" of DCS employees despite their failure to follow DCS procedure. 978 N.E.2d at 435-36. Defendants actions were all carried out in the course of a DCS investigation, and the wrongfulness of their actions does not change this conclusion under *Huck*. Breitweiser's own Amended Complaint states that Hunt visited the clinic to initiate an "investigation" [Dkt. 42 at 5 (¶ 22)] and that in doing so the Defendants "acted under the color of state law" [Dkt. 42 at 20 (¶ 182)]. Accordingly, section 31-25-2-2.5 provides Defendants with absolute immunity from liability under state law. The Court should therefore **GRANT** Defendants' Motion as to Counts III and IV.[9]

### IV.  Conclusion

For the foregoing reasons, the Magistrate Judge recommends that the Court **GRANT IN PART** and **DENY IN PART** Defendants' Motion for Judgment on the Pleadings [Dkt. 49]. Specifically, the Magistrate Judge recommends that the Court (1) grant Defendants' Motion in its entirety with respect to Counts III and IV; (2) permit Counts I and II to proceed against Hunt in her individual capacity; and (3) dismiss Counts I and II as against all other defendants.

---

[9] Because the Court finds that the Individual Defendants are entitled to immunity under section 31-25-2-2.5, the Court need not address Defendants' remaining argument that the DCS Directors are also entitled to immunity under the Indiana Tort Claims Act.

Any objections to the Magistrate Judge's Report and Recommendation must be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Dated:  10 NOV 2016

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the court's ECF system.

26