UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

BETH  BREITWEISER,                    )
                                      )
                  Plaintiff,          )
                                      )
            vs.                       )        No. 1:15-cv-01687-TWP-MJD
                                      )
NOLA  HUNT,                           )
                                      )
                  Defendant.          )

## REPORT AND RECOMMENDATION

This matter is before the Court on Defendant Nola Hunt's Second Motion for Summary Judgment.  [Dkt. 116.]  Plaintiff Beth Breitweiser alleges Fourth and Fourteenth Amendment claims stemming from an Indiana Department of Child Services (DCS) search of her apartment and subsequent investigation.  Hunt seeks summary judgment on each remaining claim.  For the following reasons, the Magistrate Judge recommends that the District Judge **GRANT IN PART** and **DENY IN PART** Defendant's Motion [Dkt. 116] and **GRANT** partial summary judgment for Breitweiser on her claims stemming from Hunt's apartment search.

## I.  Legal Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is required where the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Where, as here, the Court has proposed entering partial summary judgment for a nonmovant under Rule 56(f)(2), the Court must treat the facts as though Breitweiser had filed a cross-motion for summary judgment.  In such circumstances, "[t]he general standards for summary judgment do not change."  *Calumet River Fleeting, Inc. v. Int'l Union of Operating Engineers, Local 150*, 824 F.3d 645, 647 (7th

Cir. 2016).  The Court must still view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor.  *Id.* at 647-48; *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  The Court may not weigh evidence or make credibility determinations on summary judgment.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

## II. Facts for Summary Judgment

### A. DCS Preliminary Report

Breitweiser is a single mother of two minor children and a licensed veterinarian.  [Dkt. 126-1 at 2 (¶¶ 1-2, 6).]  In January 2015, while Breitweiser's home was under renovation, Breitweiser, her children, and her elderly mother lived in an apartment in the basement of Breitweiser's veterinary clinic ("Apartment").  [*Id.* (¶¶ 4, 8).]

On January 16, 2015, DCS received a "Preliminary Report of Child Abuse or Neglect" ("Preliminary Report"), reflecting a private individual's allegations that Breitweiser's children were victims of child abuse or neglect.  [Dkt. 119-3 at 1-2 (¶¶ 4); Dkt 120-2.]  Among the allegations reflected in the Preliminary Report were that the reporting source had "heard" that

- Breitweiser's regular home was "'in hoarder condition'" with "'boxes of stuff everywhere'" and "rat poop in various box throughout the home" [Dkt. 120-2 at 1];

- Breitweiser's Apartment was "a mess" with "'stuff everywhere,'" including dog urine and feces and "dishes piled to the ceiling in the sink" [Dkt. 120-2 at 2]; and

- Breitweiser's children "rarely take baths and they wear the same clothes all the time" [*Id.*].

The Preliminary Report noted that the intake specialist conducted a review, showing that Breitweiser had no DCS history. [*Id.*] The Preliminary Report concluded with a "recommend[ation] for assessment," meaning that it required further review. [*Id.*]

Preliminary reports, such as the Preliminary Report concerning Breitweiser, are assessed an initial urgency category, being designated for one-hour review "if the allegations would cause a reasonable person to believe that the child is in imminent danger of serious bodily harm," 24-hour review "if the allegations involve abuse," or five-day review "if the allegations involve neglect." [Dkt. 126-3 at 2.] Breitweiser's report was designated for five-day review.[1]

Hunt, a Family Case Manager for DCS, was assigned to conduct the initial investigation into the Preliminary Report. [Dkt. 119-3 at 2 (¶ 6).] Upon receiving the assignment, Hunt conducted some preliminary background research, confirming that Breitweiser had no DCS record and or criminal history. [*Id.* (¶ 7); Dkt. 126-4 at 4.] Hunt did not follow up or make any sort of investigation into the nature or veracity of the reporting source. [Dkt. 126-4 at 3.]

### B. Breitweiser's Initial Encounter with DCS

Hunt informed her supervisor that she was going to conduct an in-person initial investigation into the Preliminary Report. [Dkt. 126-4 at 6.] Accompanied by Family Case Manager-in-training Evan Strater, Hunt first visited Breitweiser's primary home. [Dkt. 119-3 at 2 (¶¶ 7-8).] Finding it vacant, Hunt and Strater (the "DCS Agents") proceeded to Breitweiser's veterinary clinic. [*Id.*] The DCS Agents arrived at the clinic Friday afternoon, after the clinic's usual business hours, in an unmarked, private vehicle. [Dkt. 126-1 at 3 (¶¶ 11, 13).] Hunt wore jeans, a dirty tee shirt, and unkempt hair. [*Id.* (¶ 13).]

---

[1] Breitweiser cites to page 48 of Hunt's deposition for this proposition, which should be located at Docket 126-4 between ECF pages four and five. Apparently due to an oversight, page 48 is missing. Hunt, however, did not challenge this assertion in her reply or supplemental briefs. Accordingly, the Court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

The DCS Agents entered the clinic lobby, where Hunt saw Breitweiser's mother and children. [Dkt. 126-4 at 9.] Each appeared to be dressed appropriately and did not appear to be physically harmed or distressed in any way. [*Id.*] Hunt briefly observed Breitweiser's children interacting and "[j]ust being kids." [*Id.*]

Amanda Smith, who was working at the clinic reception desk, greeted the DCS Agents and inquired multiple times into their identities and purpose. [Dkt. 126-1 at 3 (¶¶ 14-15).] The DCS Agents refused to identify themselves and demanded to speak with Breitweiser. [Dkt. 126-1 at 3 (¶¶ 14-15); Dkt. 126-4 at 10.] This refusal was contrary to DCS policy. [Dkt. 126-7 at 3 (¶ 8).] Breitweiser could hear the DCS Agents from her private office, and overheard Hunt tell Smith that she would identify herself if Breitweiser would "give up [her] personal rights." [Dkt. 126-2 at 7.] Breitweiser heard Hunt tell Smith that she would call the police. Hunt and Smith then stepped outside. [Dkt. 126-1 at 4 (¶ 18).] Hunt contacted Kate Peterson, her acting supervisor, who instructed Hunt to wait for police to arrive and then to enter the apartment. [Dkt. 119-3 at 3 (¶ 13); Dkt. 119-5 at 2 (¶ 6).]

Breitweiser heard the DCS Agents step outside and believed that they had left. [Dkt. 126-1 at 4 (¶ 18).] She gathered her family and left via the rear door of the clinic, next to which her car was parked. [*Id.* (¶ 18).] As Breitweiser drove away, Strater stepped in front of Breitweiser's car. [*Id.* (¶ 20).] Breitweiser swerved to avoid Strater and drove away.[2] [*Id.*]

---

[2] Hunt protests that the evidence to which Breitweiser cites is not "competent to demonstrate" that Hunt was aware that Breitweiser and her family had left the Apartment and that Hunt did not have permission to enter. [Dkt. 133 at 2.] But Breitweiser cites to Hunt's deposition, where Hunt testified that she knew that Breitweiser had her children and mother in the car when she left [Dkt. 126-4 at 12] and knew that no one had authorized her to enter the apartment [Dkt. 126-4 at 16]. Hunt makes no attempt to explain how this testimony is incompetent to "demonstrate what Defendant knew or was aware of" [Dkt. 133 at 2], and undeveloped arguments are waived. *See United Cent. Bank v. Davenport Estate LLC*, 815 F.3d 315, 318 (7th Cir. 2016); *see also* Fed. R. Evid. 103(a)(1)(B) (requiring that party state "specific ground" to preserve evidentiary objection).

During the entire encounter, Breitweiser was unaware that Hunt and Strater were DCS Agents. [*See* Dkt. 126-1 at 4-5 (¶¶ 21, 24).]

### C. Hunt's Investigation of the Apartment

After Breitweiser left, officers from the Indianapolis Metropolitan Police Department (IMPD) arrived at the clinic. [Dkt. 126-1 at 5 (¶ 29).] Breitweiser called Smith, who informed Breitweiser that the DCS Agents had reentered the clinic and had demanded to inspect the Apartment. [Dkt. 126-1 at 4 (¶ 21); Dkt. 126-2 at 9-10.] Smith put Hunt on the phone. [Dkt. 126-1 at 4 (¶ 23).] Breitweiser again inquired of Hunt's identity and purpose. [*Id.*] According to Breitweiser, Hunt responded that she was with "CPS" and said "You're running. You know who I am." [Dkt. 126-2 at 10.] Breitweiser asked "What is CPS? [Hunt] says, Child Protective Services. You know darn good and well who I am. [Hunt says], I'm going to make your life a living hell if you don't come back." [*Id.*] Breitweiser told Hunt that she did not have permission to be on the premises and asked if she had a search warrant. [Dkt. 126-1 at 5 (¶ 25).] Hunt replied that "she 'didn't need one.'" [*Id.*] In fact, Hunt did not have any warrant or court order to search the Apartment. [Dkt. 126-4 at 16.]

After speaking on the phone with Hunt, Breitweiser called her attorney, Scott Treadway. [Dkt. 126-1 at 5 (¶ 26); Dkt. 126-2 at 12.] Treadway called the clinic and asked to speak with Hunt. [Dkt. 126-1 at 5 (¶27).] Hunt refused to speak with Treadway. [*Id.* (¶ 27).] Treadway then spoke with an IMPD officer, who informed Treadway that they were not there to assist with the DCS Agents' investigation, but had come to maintain order. [Dkt. 126-1 at 5 (¶ 29).] Treadway advised the IMPD officer that the DCS Agents were not permitted to enter or search the clinic or Apartment. [Dkt. 119-3 at 3 (¶ 14).]

Notwithstanding the lack of permission, warrant, or court order, the DCS Agents directed Smith to let them into the Apartment and entered in violation of DCS policy. Hunt threatened to take Smith's children as a "co-conspirator" if she refused to permit them to enter. [Dkt. 119-2 at 15.] Once inside, the DCS Agents took numerous photographs. [Dkt. 120-3; Dkt. 119-3 at 3 (¶ 15).] These photographs appear to corroborate at least some of the allegations in the Report, revealing stacks of dirty dishes, dog excrement on the floor, filled trash bags, and, in the freezer, a box marked "injections." [*Id.*]

According to Breitweiser, whose side the Court must credit in considering Hunt's Motion, each of these observed issues had a reasonable explanation. The dirty dishes had been assigned to her daughter as part of her chores and as punishment for "sassing" her mother; one side of the filled sink contained clean dishes that only needed to be put away. [Dkt. 126-1 at 6 (¶ 37); Dkt. 126-2 at 4-5.] The dog excrement was all near a table and would have taken about five minutes to clean. [Dkt. 126-4 at 21.] The bags of "trash" actually contained the children's toys. And the box marked "injections" in the freezer was just an empty box. [Dkt. 126-1 at 6 (¶ 37).]

After taking the photographs, and without otherwise opening anything, the DCS Agents departed.

## D. Hunt's Encounter with Breitweiser, According to Hunt[3]

Hunt's version of her initial contact with Breitweiser and inspection of the Apartment largely tracks Breitweiser's, except as follows: Upon arriving at Breitweiser's clinic, Hunt did

---

[3] Solely for the purposes of evaluating whether summary judgment for Breitweiser is appropriate on her claims stemming from Hunt's warrantless search, the Court here sets out Hunt's version of these events—as articulated in Hunt's supplemental brief [Dkt. 133]—where it deviates from Breitweiser's story and to the extent it is supported by citation to admissible evidence. *See, e.g., Lessley v. City of Madison, Ind.*, 654 F. Supp. 2d 877, 890 (S.D. Ind. 2009) ("Because both sides have moved for summary judgment, the court must consider the evidence through two different lenses. When considering defendants' motions, the court gives plaintiffs the benefit of conflicts in the evidence and favorable inferences. When considering plaintiffs' motions, defendants receive those benefits.").

not demand to speak with Breitweiser but instead requested to speak with her. [Dkt. 119-3 at 2 (¶ 10).] When Smith inquired as to Hunt's purpose, Hunt informed Smith that her visit concerned a personal matter. [*Id.* (¶ 9).] Hunt stated that she needed Breitweiser's consent for Hunt to identify herself and purpose [*id.* at 2-3 (¶ 10)], though the undisputed evidence demonstrates that this representation was contrary to DCS policy [Dkt. 126-6 at 2; Dkt. 126-7 at 3 (¶ 3)]. The results of Hunt's search corroborated the Report's allegations regarding the condition of the Apartment. [Dkt. 119-3 at 3 (¶ 14).] At no point during her visit to the clinic did Hunt threaten Smith, nor did Hunt threaten Breitweiser while speaking with her on the telephone. [Dkt. 119-3 at 5 (¶ 22).]

### E. Hunt's Investigation and Assessment

After leaving the Apartment, Hunt again called Peterson and reported her observations. [Dkt. 119-3 at 4 (¶ 14); 119-5 at 2 (¶ 7).] Hunt suggested that she should temporarily remove Breitweiser's children until a court hearing could be held. [Dkt. 119-3 at 4 (¶ 14); 119-5 at 2 (¶ 7).] Based upon Hunt's report, Peterson agreed that temporary removal was appropriate and instructed Hunt to remove Breitweiser's Children. [Dkt. 119-3 at 4 (¶ 14); 119-5 at 2 (¶ 7).]

Hunt returned to Breitweiser's primary home to look for Breitweiser's children. [Dkt. 119-3.] Breitweiser, concerned by the DCS Agents' conduct, did not return to her home or her Apartment, but instead took her children to stay with acquaintances and her mother to stay in Lexington, Kentucky. [Dkt. 119-2 at 3-8.] Finding that Breitweiser and her children were not home, Hunt left a document entitled "**ADVISEMENT OF LEGAL RIGHTS FOR PARENTS, GUARDIANS OR CUSTODIANS REGARDING CHINS PROCEEDINGS**" ("Advisement") [Dkt. 120-1 at 1 (emphasis in original)] with someone at the home [Dkt. 126-5 at 7]. The Advisement, printed on DCS letterhead, provided as follows:

Your child(ren) has been taken into custody. Pursuant to Indiana statutes, you are advised of the following legal rights:

1. You have the right to a detention hearing held by the Court within forty-eight (48) hours after the child's(ren) removal from the home and to request return of the child(ren) at the hearing.

2. At each and every Court proceeding on a petition alleging that your child(ren) is in need of services, you have the right to:
   (a) be represented by an attorney;
   (b) cross-examine (question) witnesses;
   (c) obtain witnesses or documents through a Court subpoena; and
   (d) present evidence on your own behalf.

. . .

7. You have the right to reports and information concerning this investigation from the Marion County Office of Family and Children and from the Juvenile Court.

**I WAS VERBALLY ADVISED OF THE CONTENTS OF THIS DOCUMENT AND WAS PROVIDED A COPY OF THIS DOCUMENT. I UNDERSTAND THAT A HEARING WILL BE HELD AT JUVENILE COURT (2451 N. KEYSTONE AVE., INDIANAPOLIS) ABOUT THE REMOVAL OF MY CHILD(REN) ON** 1/21/15 [date handwritten on provided line] **AT 12:00 P.M. I HAVE READ AND UNDERSTAND MY RIGHTS.**

[Dkt. 120-1 at 1 (emphasis in original).] At the bottom of the Advisement was a blank line for the signature of a "Parent, Guardian or Custodian." [*Id.*] The Advisement was signed and dated by Hunt. [*Id.*] Leaving the Advisement was not in accordance with DCS policies because Breitweiser's children had not been physically detained. [Dkt. 126-7 at 3 (¶ 4).]

On January 20, 2015, Hunt corresponded with Treadway via email, stating, "Please be advised your client is to attend the scheduled court hearing tomorrow (1/21/15) at the Marion County Juvenile Detention Center. Your client will need to arrive no later than 12pm. [Redacted children's names] will need to accompany your client as DCS is asking removal [sic] of the children." [Dkt. 120-5 at 47.] Breitweiser had not been served with any notice or other court documents at that time. [*Id.*]

The juvenile court rescheduled the hearing for January 27, 2015, and held a telephonic conference on January 21, 2017. [Dkt. 126-1 at 8 (¶ 56).] At the conference, the juvenile court

directed DCS to again inspect the Apartment. [*Id.* (¶ 57).] This inspection revealed that the Apartment was in a safe and acceptable condition. [*Id.* (¶ 58).]

On January 26, 2015, Hunt completed a "Verified Petition Alleging Children to Be in Need of Services" ("Petition"), thus initiating Child in Need of Services ("CHINS") proceedings. [Dkt. 120-5 at 3-5.] The Petition, made pursuant to the penalties for perjury, contained numerous allegations, including:

1. Beth Breitweiser . . . has failed to provide the children with a safe, stable, and sanitary living environment.
2. During the [DCS] investigation, Dr. Breitweiser fled the scene with her children in the car and almost ran over the Family Case Manager (FCM).
3. The family is residing in the basement of an animal hospital because their primary residence is in deplorable condition.
4. The basement of the animal hospital was found to be cluttered with dirty dishes, clothing, and animal urine and feces.
5. Animal injections were located in the children's living quarters.
6. Ms. Breitweiser has failed to cooperate with the assessment and the safety of the children cannot be ensured in her care.
7. Due to the foregoing reasons, the coercive intervention of the Court is necessary to ensure the children's safety and well being.

[Dkt. 120-5 at 3-4.] The Petition further "incorporated . . . by reference" the Preliminary Report completed when the initial allegations were made. [Dkt. 120-5 at 4.] The Petition and a "Request for Filing of Petition Children to Be in Need of Service" [sic], also signed by Hunt, were filed in juvenile court on January 27, 2015. [Dkt. 120-5 at 1-2.]

On February 13, 2015, Hunt completed an "Assessment of Alleged Child Abuse or Neglect" ("Assessment"), approved by Hunt's regular supervisor, concluding that the initial allegations against Breitweiser were "Substantiated." [Dkt. 120-4 at 3.] The Assessment recounted the events of January 16, 2015, including the unannounced visit to the clinic and search of the Apartment. [Dkt. 120-4 at 2-3.] The Assessment additionally noted several observations made after the January 16 visit:

- On January 20, 2015, Hunt observed that the Apartment was "clean and was free from trash and clutter," though the children still had "access to an unlocked freezer that contains objections [sic] for animals" and had "full access to the clinic." [*Id.*]

- On January 28, 2015, another Family Case Manager interviewed each of Breitweiser's children. [Dkt. 120-4 at 2-3.] Both interviews were unremarkable, with the Family Case Manager concluding that the children were free from "visible marks and bruises" and noting that the children assist with Breitweiser's mother's care as part of their chores. [*Id.*]

- On February 12, 2015, Hunt observed that the Apartment was "clean with functional utilities." [Dkt. 120-4 at 3.]

The Assessment concluded:

> Neglect in the form of environment live/health endangering is substantiated . . . to a preponderance of the evidence to prove the allegations [sic] to be true. This is due to the fact during the course of the investigation serious concerns for the safety of the children arose. Attempts to communicate with Dr. Breitweiser were unsuccessful due to the fact that Dr. Breitweiser fled the scene in her car with her children nearly striking FCM Hunt and FCM Strater . . . Assessment of the living conditions in the basement of Dr. Breitweiser [sic] uncovered inadequate conditions for the children. . . .

[*Id.*]

After the "Substantiated" finding, Breitweiser's case was transferred to a "Permanency" Family Case Manager for further proceedings. [*Id.*; Dkt. 119-3 at 3 (¶¶ 22-23).] Hunt had no further involvement with Breitweiser's case after completing the Assessment.

DCS Division Manager Maribryn McGeney later reviewed of Hunt's Assessment and investigation and concluded that Hunt was too "pushy." [Dkt. 126-9 at 4.] According to McGeney, the investigation was not "as objective as it should have been" and the Assessment should not have been substantiated. [Dkt. 126-9 at 3.]

**F. CHINS Proceedings**

On January 27, 2015, the juvenile court granted DCS's request to file the CHINS petition signed by Hunt, finding "probable cause to believe that [Breitweiser's] children are in need of services because they are seriously endangered."  [Dkt. 120-5 at 12.]  On January 28, 2015, the juvenile court held an "Initial/Detention Hearing" at which it granted DCS temporary wardship, but found that "removal of [Breitweiser's children] was not necessary to protect the child(ren)." [Dkt. 120-5 at 16-17.]  On January 28, 2015, and again on February 19, 2015, Breitweiser moved to dismiss the CHINS proceedings.  [Dkt. 120-5 at 21-26, 31-42.]  On March 16, 2015, DCS moved to dismiss the CHINS proceedings without prejudice [Dkt. 120-5 at 84-87], which was granted later the same day [Dkt. 120-5 at 88].

On May 20, 2015, DCS issued a "Notice of Assessment Outcome and Right to Request Administrative Review," reflecting that the allegations against Breitweiser were "substantiated." [Dkt. 1-7.]  On June 4, 2015, Breitweiser petitioned for administrative review of DCS's decision. [Dkt. 1-8.]  On June 12, 2015, a previously-uninvolved DCS division manager reviewed Breitweiser's file and concluded that the allegations were "unsubstantiated."  [Dkt. 1-9.]  At no point did DCS ever take physical custody over Breitweiser's children.

**G. Procedural History**

On October 23, 2015, Breitweiser brought suit in this Court against Hunt, DCS, and two of Hunt's supervisors under state law and 42 U.S.C. § 1983.  [Dkt. 1.]  On March 9, 2016, Breitweiser filed her currently-operative Amended Complaint alleging substantially the same claims.  [Dkt. 42.]  On November 29, 2016, the Court granted the defendants' motion for judgment on the pleadings in part, dismissing all state law claims and § 1983 claims against DCS and Hunt's supervisors.  [Dkt. 112 *adopting* Dkt. 103.]  The Court determined that Breitweiser's

Fourth Amendment unreasonable search claim and Fourteenth Amendment substantive and procedural due process claims should proceed against Hunt.  [*Id.*]  Hunt seeks summary judgment on each of these claims.  [Dkt. 116.]  In response to the parties' briefing on Hunt's Motion [Dkt. 117; Dkt. 125; Dkt. 127], the Court ordered the parties to file supplemental briefs addressing whether partial summary judgment should issue in Breitweiser's favor under Federal Rule of Civil Procedure 56(f).  [Dkt. 132.]  The parties have responded to the Court's Order [Dkt. 133; Dkt. 134], and the issue is now ripe for determination.

## III.  Discussion

Hunt seeks summary judgment on Breitweiser's remaining Fourth Amendment and Fourteenth Amendment substantive and procedural due process claims, asserting that she is entitled to qualified immunity.  Hunt argues that Breitweiser has failed to establish the alleged constitutional violations and that, in the alternative, the violations were not clearly established at the time of her investigation.

"Government officials performing discretionary functions are entitled to qualified immunity from suit 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'"  *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 352 (7th Cir. 2005) (quoting *Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).  "[O]nce the defense is raised, it becomes the plaintiff's burden to defeat it."  *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008).

To deny defendants' claim to qualified immunity on summary judgment, the plaintiff must (1) "establish that the actions of the defendant violated his constitutional rights" and (2) establish that "the contours of the right [are] sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right."  *Lee v. Young*, 533 F.3d 505, 512 (7th

Cir. 2008). The Court, in its "sound discretion," may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Satisfying the second prong generally requires the plaintiff to "point to closely analogous" precedential authority "decided prior to the defendants' challenged actions." *Upton v. Thompson*, 930 F.2d 1209, 1212 (7th Cir. 1991) (internal quotation omitted); *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995) ("[D]istrict court decisions cannot *clearly* establish a constitutional right."). This showing does not "require a plaintiff to produce a case that is 'directly on point' in order to show that a right is clearly established." *Kiddy-Brown*, 408 F.3d at 356 (quoting *Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996)). Moreover, "[a] plaintiff can defeat qualified immunity by showing 'that the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case.'" *Lessley v. City of Madison*, 654 F. Supp. 2d 877, 901 (S.D. Ind. 2009) (Hamilton, C.J.) (quoting *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008)).

The Court addresses Hunt's arguments and the applicability of qualified immunity to each constitutional claim in turn.

**A.  Warrantless Search**

Hunt admits that her initial inspection of Breitweiser's Apartment constituted a search under the Fourth Amendment and was conducted without warrant or court order. Nonetheless, Hunt first argues that she was not required to have a warrant for her initial search of Breitweiser's apartment because "imposing a warrant requirement could frustrate the legitimate government purpose" of investigating allegations of child neglect. [Dkt. 117 at 2.] Specifically, Hunt suggests that exigent circumstances or "special needs" existed, such that the warrantless

13

search was reasonable.  Finally, Hunt argues that even if a warrant was required, such a requirement was not clearly established at the time of her search.[4]

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  The Fourth Amendment is incorporated against the states by the Fourteenth Amendment, and "[t]he touchstone of the Fourth Amendment inquiry is reasonableness." *Narducci v. Moore*, 572 F.3d 313, 319 (7th Cir. 2009) (quoting *Green v. Butler*, 420 F.3d 689, 694 (7th Cir. 2005)).  The Fourth Amendment's "prohibition against unreasonable searches and seizures protects against warrantless intrusions during civil as well as criminal investigations by the government." *Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003) (citing *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978)).  "With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001).  "So it is 'a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are **presumptively unreasonable**.'" *Hawkins v. Mitchell*, 756 F.3d 983, 991 (7th Cir. 2014) (emphasis added) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation omitted)).

By asking that the Court not "impos[e] a warrant requirement" on DCS agents conducting home inspections, it appears Hunt misapprehends the current state of the law

---

[4] Hunt additionally argues that she is entitled to summary judgment on Breitweiser's claim that the DCS Agents' attempt to block Breitweiser from leaving the Apartment constitutes an unreasonable seizure. But Breitweiser's Statement of Claims [Dkt. 94 at 2-3] includes no such claim, nor do any of Breitweiser's briefs argue that such a claim exists.  The Court therefore does not address this issue any further.

regarding caseworker searches during child neglect investigations. In *Doe v. Heck*, decided in 2003, the Seventh Circuit held that a caseworker may not "conduct an investigation of child abuse on private property without a warrant or probable cause, consent, or exigent circumstances" without running afoul of the Fourth amendment. 327 F.3d at 515-16. And in *Michael C. v. Gresbach*, decided in 2008, the Seventh Circuit reiterated that *Heck* held that caseworkers do not get a pass from ordinary Fourth Amendment principles, concluding that "we do not believe that requiring a child welfare caseworker to act in accordance with basic Fourth Amendment principles is an undue burden on the child welfare system." 526 F.3d 1008, 1018 (7th Cir. 2008) ("As we stated above, the structures of the Fourth Amendment apply to social workers."); *id.* at 1016 ("We do not exempt child welfare workers from adhering to basic Fourth Amendment principles under non-exigent circumstances."). This Court is not imposing a warrant requirement in this case; rather, the Seventh Circuit determined at least as early as 2003 that caseworkers are not exempt from the Fourth Amendment's warrant requirement absent the availability of an established exception.

This same line of cases also forecloses Hunt's "special needs" argument. The Seventh Circuit has recognized that

> the Supreme Court has also held that occasionally the government may have 'special needs, beyond the normal need for law enforcement, [which] make the warrant and probable cause requirement impracticable.' *Vernonia Sch. Dist.,* 515 U.S. at 653, (citation omitted). In 'special needs' cases, a lower standard may be appropriate, 'depend[ing] in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.' *Camara,* 387 U.S. at 533.

*Doe v. Heck*, 327 F.3d 492, 513 (7th Cir. 2003). As *Heck* discusses, the special needs exception applies only where the settled exceptions (exigent circumstances, plain view, consent) do not adequately account for the government's interest in taking a particular action.

But in *Heck* and again in *Gresbach*, the Seventh Circuit rejected attempts to expand the special needs exception to caseworker investigations of child abuse or neglect, holding that

> *Heck* foreclosed the justification of the "special needs" exemption in this context, because states have "the ability to take immediate action to ensure the physical safety of a child suspected of abuse who is located on private property" through the exigent circumstances exception to the warrant requirement of the Fourth Amendment. *Heck,* 327 F.3d at 517 n. 20.

*Gresbach,* 526 F.3d at 1016 n.3. Hunt has not identified any "special need" for warrantless searches in this particular context that the Seventh Circuit did not squarely reject in *Heck* and *Gresbach* or that could not be adequately accommodated by the exigent circumstances exception to the warrant requirement.[5] *See Heck,* 327 F.3d at 517 ("[G]iven that the exigent circumstances exception already gives the State the ability to take immediate action to ensure the physical safety of a child suspected of abuse who is located on private property, there is no apparent justification for carving out a "special needs" exception for child abuse investigations in this context."); *see also Ferguson v. City of Charleston,* 532 U.S. 67, 84 (2001) (noting that if the "broad[] social purpose or objective" of the state were the predominate consideration in a Fourth Amendment inquiry, "virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate, purpose"). The "special needs" exception does not apply to this case.

Hunt's remaining arguments are directed at the applicability of the "destruction of evidence" prong of the exigent circumstances exception to the warrant requirement. *E.g.*, *Jacobs v. City of Chicago,* 215 F.3d 758, 769-70 (7th Cir. 2000). That exception recognizes that a

---

[5] To the extent Hunt asserts that the constitutionality of her search was governed by a generalized "reasonableness" test, *Heck* foreclosed this argument as well. The Seventh Circuit has applied the reasonableness test in cases dealing with searches "on public school grounds with the consent of public school officials." 327 F.3d at 514. The court held, however, that warrantless searches on private property are presumptively unreasonable, subject to the established exceptions to the warrant requirement. *Id.* at 513.

government agent may be relieved from complying with the warrant requirement where "[s]pecific facts" indicate that "evidence is likely to be destroyed." *Id.* at 770. The agent bears the burden of demonstrating that she had an "objectively reasonable belief" that evidence was likely to be destroyed "at the time of their warrantless entry into the defendants' residence." *United States v. Robles*, 37 F.3d 1260, 1263 (7th Cir. 1994).

The reasonable belief inquiry asks "whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." *Id.* Even where someone refuses to permit a government agent to enter or asks to see a warrant, the agent "cannot, without some other suspicious activity, justify a warrantless entry based solely on the fear that evidence might be destroyed." *United States v. Etchin*, 614 F.3d 726, 733 (7th Cir. 2010). Rather, the Seventh Circuit's cases "reflect the rule that an emergency justifying entry and a search arises only if the [agent] knocking at the door observes objective evidence," *id.* at 733-34 (collecting cases), indicating an "imminent danger" that evidence will be destroyed, *Jacobs*, 215 F.3d at 770. Exigent circumstances only excuse the warrant requirement for "entry and securing of the residence"; once the threat of destruction of evidence is eliminated, any "subsequent search or seizure must be justified by a warrant or an exception to the warrant requirement." *Id.* at 1264.

Now flipping the traditional Rule 56 standard to view the facts in the light most favorable to Hunt, the Court concludes that Hunt fails to overcome the presumptive unreasonableness of her search on the basis of the exigent circumstances exception. In response to the Court's Order Requesting Supplemental Briefing [Dkt. 132], in which the Court expressly invoked Rule 56(f)(1) to allow Hunt an opportunity to respond to the possibility of granting partial summary judgment to Breitweiser, Hunt did not offer any additional evidence to support her invocation of

the exigent circumstances exception. [*See* Dkt. 133.] And the supposed disputes of material fact

to which Hunt points (set out in Part II.D, *supra*) are simply immaterial to whether a reasonable

agent would believe that destruction of evidence was likely.[6] The only arguably relevant facts to

which Hunt points are (1) Breitweiser's abrupt departure and refusal to speak with Hunt and (2)

the fact that Smith, a clinic employee, was present and had the ability to open the apartment.[7] As

a threshold matter, this falls far short of identifying "specific facts" justifying an objectively

reasonable belief that destruction of evidence was imminent. Hunt identifies nothing more than

a generalized "fear" that evidence could be destroyed. *Cf. Etchin*, 614 F.3d at 734 ("Detective

Rietzler then lists as reasons for entering that she heard a man's voice inside, that she thought the

man might be Bowman, and that she feared that evidence might be destroyed. This is too vague

to justify [entrance on the basis of exigent circumstances.]"). As a consequence, no exigent

circumstances entitled Hunt to even enter Breitweiser's apartment in the first place.

     The Court could simply stop there and conclude that Hunt has failed to demonstrate that a

genuine issue exists as to the applicability of the exigent circumstances exception. But the

additional undisputed evidence Breitweiser identifies further demonstrates the inapplicability of

the exception: (1) Breitweiser, the individual under investigation, had left and taken her mother

and children with her before Hunt searched the Apartment; (2) at the time Breitweiser left,

---

[6] Hunt makes no argument, for example, as to how not threatening Breitweiser is relevant to the potential for destruction of evidence.

[7] Hunt also points to her "inability to secure the apartment in any way for the time required to obtain a court order." [Dkt. 133 at 6.] The Court addresses this further *infra*, but pauses only to note that the presence of exigent circumstances is a condition precedent to warrantless entrance for the purpose of securing the evidence in danger of destruction. Moreover, this argument is unsupported by the record evidence, which shows that uniformed police officers—who unquestionably did have such authority— were already on the scene at the time of Hunt's search. Hunt's bald assertion seems to imply that the IMPD officers would not have secured the premises, but such speculation could not defeat summary judgment.

neither Breitweiser nor Smith knew that Hunt and Strater were DCS Agents; and (3) at the time Hunt entered the Apartment, IMPD officers had arrived on the scene.[8]  Each of these facts moves this case further afield of a reasonable belief that destruction of evidence was likely—which is the threshold inquiry to determine whether **any** warrantless entry into the Apartment was appropriate.  But Hunt's claim of exigent circumstances fails at the next step as well, because even if warrantless entry is appropriate under the destruction of evidence exception, it is only available to the extent required for the government to secure the place to be searched.  The ongoing presence of IMPD officers demonstrates that the Apartment was "secure" without any need to actually enter and search it.

The bottom line is that the mere presence of a person with access to potential evidence is insufficient as a matter of law to trigger the exigent circumstances exception.  Hunt's subjective fear that Smith or someone else might try to alter the Apartment cannot support Hunt's claim to the exception, and Hunt fails to point to any objective evidence to support a reasonable belief that destruction was imminent.  Against this backdrop, there is no genuine issue of material fact that could preclude summary judgment as to the unconstitutionality of Hunt's warrantless search.

As should be clear from the foregoing discussion and the Court's prior order on the pleadings [Dkt. 103 at 14-20, *adopted*, Dkt. 112], the rights at issue were "clearly established" at

---

[8] In her supplemental brief, Breitweiser identifies evidence that Smith told Hunt that the "basement was in deplorable condition," further suggesting that Smith was not predisposed to impede or spoliate evidence but instead sought to aid Hunt's investigation.  [*See* Dkt. 134 at 3-4 (quoting Dkt. 126-4 at 11).] But while Breitweiser claims to raise this additional evidence in response to Hunt's argument that it was reasonable to enter the Apartment because of Smith's presence, Hunt first raised her argument in her initial brief.  [Dkt. 117 at 13 ("After Plaintiff left the scene during the assessment, Plaintiff's employee Amanda Smith remained and had ability [sic] to enter the apartment.  If Defendant Hunt departed the apartment to obtain a warrant . . . , the public interest would be frustrated by providing an opportunity for plaintiff or her employee to remove or conceal any evidence of child neglect . . . .").]  Breitweiser's additional evidence therefore comes too late, as it should be have been raised in Breitweiser's response. *See Russell v. Chicago Bd. Of Educ.*, 90 Fed. App'x 966, 968 (7th Cir. 2004).

the time of Hunt's search, such that a reasonable public official would have known that that the conduct at issue was unlawful, *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 352 (7th Cir. 2005). For the sake of thoroughness, however, the Court again revisits the case law underlying this determination.

*Heck*, decided in 2003 and discussed briefly above, addressed two separate Fourth Amendment violations stemming from an investigation of child abuse allegations at a private school. 327 F.3d 492, 509-17 (7th Cir. 2003). The first is not relevant to this case: the court held that caseworkers, investigating allegations of child abuse, unconstitutionally "seized" the plaintiff by escorting the child from class and questioning him without warrant or court order. *Id.* at 510. The second, however, is directly on point: the caseworkers also "searched" the school by entering it as part of their investigation into alleged child abuse "for the specific purpose of gathering information, an activity that most certainly constitutes a search under the Fourth Amendment." *Id.* The Seventh Circuit held that the caseworkers' search violated the Fourth Amendment, because "requiring caseworkers to obtain the equivalent of a warrant before searching the premises of a private school ensures that the constitutional interests of the child, parents, and school, are safeguarded, while at the same time preserving the state's compelling interest in protecting children from being abused." *Id.* at 514. The court "ma[d]e it clear that it is patently unconstitutional for governmental officials to search the premises of a private or parochial school . . . without a warrant or court order, probable cause, consent, or exigent circumstances." *Id.* at 517.

Moreover, by explicitly holding that "the strictures of the Fourth Amendment apply to child welfare workers," *id.* at 509, the Seventh Circuit articulated "a general constitutional rule" that applies "with obvious clarity to the specific conduct" in this case, *Gresbach*, 526 F.3d at

1017.  The apposite facts of *Heck*, in addition to the clear holding, together "gave defendant[]

fair warning that their alleged treatment of plaintiff[] was unconstitutional."  *Id.*

> As the Court earlier observed,
>
> The sanctity of the home stands at the 'very core' of the Fourth Amendment, *Hawkins* [*v. Mitchell*, 756 F.3d 983, 991 (7th Cir. 2014)] (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)), and is subject to an even greater privacy interest than the private school at issue in *Heck*, *see, e.g.*, *Payton*, 445 U.S. at 585 ('[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' (internal quotation omitted))."

[Dkt. 103 at 16]; *Heck*, 327 F.3d at 511 ("The Supreme Court has explicitly recognized the

distinction between searches and seizures that take place on a man's property—his **home or**

**office**—and those carried out elsewhere, holding that a search or seizure carried out on private

premises without a warrant is per se unreasonable, unless the government can show that it falls

within one of a carefully defined set of exceptions based on the presence of 'exigent

circumstances.'" (internal quotations and alterations omitted) (emphasis added)).  This

observation rings true still, as does the conclusion that "[t]he contours of the law as of January

2015, when Hunt's . . . search of Breitweiser's apartment occurred, clearly established that a

caseworker was required to have a court order before searching a private residence—at least

absent the availability of some exception to the Fourth Amendment warrant requirement."  [Dkt.

103 at 19.]

The undisputed evidence demonstrates that Hunt's search did not fall within a recognized

exception to the warrant requirement.  Therefore, the Magistrate Judge recommends that the

District Judge **DENY** Hunt's Motion for Summary Judgment and **GRANT** summary judgment

in Breitweiser's favor as to her Fourth Amendment claim.

**B. Substantive Due Process**

Hunt next seeks summary judgment on Breitweiser's Fourteenth Amendment substantive

due process claim, arguing that the evidence as a matter of law fails to establish such a claim.

Hunt further argues that any such substantive due process violation was not clearly established.[9]

Substantive due process protects "the right to family relations," in recognition that the

right "to bear and raise their children is the most fundamental of all rights." *Brokaw v. Mercer*

*Cty.*, 235 F.3d 1000, 1018 (7th Cir. 2000). "[T]he constitutional right to familial integrity is not

absolute" and is limited by the government's compelling interest in the protection of children. *Id.*

The right to familial relations "does not include the right to be free from child abuse

investigations." *Heck*, 327 F.3d at 520. Thus, the Court must balance the competing interests of

the family and the state under a "reasonableness test," considering

> (1) the nature of the privacy interest upon which the action taken by the State
> intrudes; (2) the character of the intrusion that is complained of; (3) the nature and
> immediacy of the governmental concern at issue; and (4) the efficacy of the
> means employed by the government for meeting this concern.

*Id.* The Court must ultimately evaluate whether the government's action was justified under the

circumstances. *Id.*

Hunt renews her claim to qualified immunity that was rejected by the Court on the

pleadings. As the Court earlier noted, the Seventh Circuit has recognized that

> [c]ases claiming governmental interference with the right of family integrity are
> properly analyzed by placing them, on a case by case basis, along a continuum
> between the state's clear interest in protecting children and a family's clear interest
> in privacy. When the facts of a case place it in the center of the continuum where
> the two interests overlap and create a tension, the right to family integrity may
> properly be characterized as nebulous, and thus a defendant may claim the
> protection of qualified immunity. However, when the facts of a case place it

---

[9] Hunt briefly argues in her initial brief that Breitweiser's claims are foreclosed by the *Rooker-Feldman*
doctrine. [Dkt. 117 at 18-19.] But Hunt does not refer to this argument in either her reply or
supplemental briefs, and it appears to pertain to claims that Breitweiser is not pursuing. The Court thus
considers the argument abandoned or waived.

squarely on the end of the continuum where the state's interest is negligible and where the family privacy right is well developed in jurisprudence from this circuit and the Supreme Court, a defendant's defense of qualified immunity, based on a claim that the right to family integrity was not clearly established, will fail.

[Dkt. 103 at 23 (quoting *Brokaw*, 235 F.3d at 1023 (quoting *Morris v. Dearborne*, 181 F.3d 657, 671 (5th Cir. 1999))).] When this matter was before the Court on the pleadings, there were insufficient "facts to determine where along the continuum this case falls." [*Id.* (quoting *Brokaw*, 235 F.3d at 1023.] Now, however, with a developed record, the Court finds it prudent to begin with the second prong of the qualified immunity analysis. Thus, the Court first evaluates whether Breitweiser has established that a "reasonable public official" would have known that her conduct was unconstitutional under the circumstances. *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 352 (7th Cir. 2005).

Breitweiser argues that *Heck* put Hunt on notice that her actions were unconstitutional; in other words, Hunt argues that this case stands near *Heck* on the "continuum" of familial interest claims.[10] *Heck* involved familial interest claims on three grounds: "(1) the defendants' custodial interrogation of John Jr. without notifying or obtaining the consent of his parents; (2) the defendants' investigation of the plaintiff parents for child maltreatment because they authorized private school officials to use corporal punishment as a means of disciplining their children; and (3) the defendants' threat to remove John Jr. and his sister from their parents' custody." 327 F.3d at 526. The only basis the caseworkers had for taking any of these actions was the fact that the plaintiffs permitted their children to attend a school that used corporal punishment. But, as

---

[10] Breitweiser argues that Hunt "had no articulable basis to remove or threaten to remove a child" under "Indiana law and DCS policy." [Dkt. 125 at 34.] But violations of state law or agency policy do not establish a constitutional violation—binding case law does. *See, e.g.*, *Ault v. Speicher*, 634 F.3d 942, 947 (7th Cir. 2011) ("[F]ailure to comply with state procedures does not demonstrate the violation of Plaintiff's clearly established constitutional due process rights.").

the court observed, the parents in fact had the "right to physically discipline their children, or to delegate that right to private school officials." *Id.* at 525. Therefore, "the defendants' threat to remove the Does' children from their custody is sufficient, in and of itself, to support the Does' claims because the defendants had no reason whatsoever to suspect that Mr. and Mrs. Doe were abusing their children." *Doe v. Heck*, 327 F.3d 492, 524 (7th Cir. 2003).

Unlike *Heck*, Hunt did not have "no reason whatsoever" to suspect that Breitweiser's children could be victims of neglect. In *Heck*, there was no reason as a matter of law—the entire basis of the investigation was premised upon a misunderstanding regarding the constitutional right to corporal punishment. Hunt, meanwhile, investigated a report concerning Breitweiser's apartment and then searched the apartment (albeit unconstitutionally, as explained above), and discovered conditions that substantially corroborated the report: the photographs Hunt took reveal animal waste, trash bags, and piles of dishes, and Breitweiser also confirmed that there was a box marked "injections" in the freezer. While the Court must take Breitweiser's explanations for these issues (for example, the trash bags were filled with children's toys and the "injections" box was empty) as true, the truth of these explanations does not change what Hunt observed.[11] Hunt, moreover, told her acting supervisor about what she saw, and the supervisor agreed with Hunt that emergency removal would be appropriate. The bottom line is that "under the circumstances a reasonable [DCS caseworker] would not have understood"—based on *Heck*, which is the only binding case to which Breitweiser cites[12]—that Hunt's actions leading up to

---

[11] It is ironic that Breitweiser seems to complain that Hunt did not conduct a more invasive search of the Apartment which, according to Breitweiser, would have confirmed that the situation was not as poor as it looked at first glance.

[12] Breitweiser makes no attempt to explain how the two nonbinding cases to which she cites demonstrate that the constitutional rights were clearly established in this Circuit. But even if she had, the two cases are far afield from this one. The unconstitutional removal in *Wallis v. Spencer* was based upon allegations that the children were due to be ritualistically sacrificed—an allegation that was both plainly

and following her search of the Apartment, including refusing to identify herself, telling Breitweiser that she would make her life "hell" if she didn't return with the children, and leaving the Advisement at Breitweiser's home, violated Breitweiser's due process rights.[13]

This conclusion is buttressed by another recent Seventh Circuit opinion. In *Hernandez ex rel. Hernandez v. Foster*, for example, the court considered whether the parents' familial rights were violated by the removal of a child under the following circumstances:

> Although this is a close question, we conclude that a reasonable DCFS investigator, supervisor, and manager could have believed that removing Jaymz from his home and family was supported by probable cause given the following facts: (1) fifteen-month-old Jaymz suffered a fractured arm; (2) no one actually observed how he was injured and Jaymz could not verbalize what had happened; (3) Jaymz had an unexplained, older bruise above his left eyelid; (4) Dr. Kostinsky and Nurse Luebke suspected abuse because Jaymz's injury didn't fit with the parents' statements that he could not climb and there was nothing in his crib to climb on; (5) the parents gave conflicting reports about who was home at the time of the incident to Dr. Kostinsky and Nurse Luebke, and one could expect that they would be accurate in reporting what happened to the medical professionals; (6) Crystelle first denied that Jaymz could walk or climb, but when she was told that DCFS had been contacted, she claimed he could walk but could not climb; (7) Jaymz was observed later that same day to have the ability to walk and climb; and (8) the parents denied that anything was in the crib, but Foster observed objects in the crib. This was enough that under the circumstances a reasonable DCFS official would not have understood that taking Jaymz into temporary protective custody violated his Fourth Amendment rights [and his parents' corresponding substantive due process rights].

---

absurd and wholly uncorroborated. 202 F.3d 1126 (9th Cir. 2000). Likewise, *Croft v .Westmoreland County Children and Youth Services* involved an uncorroborated anonymous tip. 103 F.3d 1123 (3d Cir. 1997). The Third Circuit observed: "An anonymous tip may justify investigation but will not provide reasonable grounds for removal of a family member absent independent, articulable criteria of reliability; and certainly not when all evidence is to the contrary." *Id.* at 1126.

Unlike both *Wallis* and *Croft*, here Hunt did not actually remove Breitweiser's children but instead left the Advisement after substantially corroborating a report of child neglect. While Breitweiser has proffered evidence that fellow DCS workers found Hunt's actions unnecessarily aggressive, it does not follow that the unconstitutionality of Hunt's actions was clearly established at the time of her investigation.

[13] Breitweiser also appears to suggest that the warrantless search violated her substantive due process rights. But *Graham v. Connor*'s more-specific-provision rule precludes invocation of substantive due process where an actual search occurred. 490 U.S. 386 (1989).

657 F.3d 463, 677 (7th Cir. 2011). Thus, much like in this case, the caseworker observed some facts that could reasonably be consistent with child neglect; much like in this case, there were reasonable and innocent explanations for these facts, which could have been uncovered with additional investigation.[14] But given the circumstances and the facts that tended to support the caseworker's belief, the Seventh Circuit determined that qualified immunity was appropriate, just as it is here. *Cf. Mann v. Vogel*, 707 F.3d 872, 880 (7th Cir. 2013) (recognizing that threats unlawful under state law do not violate the Constitution where a caseworker acts on a corroborated complaint giving rise to "a suspicion of neglect or abuse").

Because a reasonable caseworker would not have understood based on the state of the law in the Seventh Circuit that the actions Hunt took violated Breitweiser's right to familial relations, Hunt is entitled to qualified immunity. The Magistrate Judge therefore recommends that the Court **GRANT** summary judgment for Hunt on Breitweiser's substantive due process claim.

### C. Procedural Due Process

Hunt finally seeks summary judgment as to Breitweiser's procedural due process claims. Breitweiser's response identifies two actions that she claims constitute procedural due process violations. The first is Hunt's warrantless search of the Apartment. The second is going to Breitweiser's home intending to take her children and leaving the Advisement at the home.

Procedural due process claims require "a two-step inquiry: (1) whether the defendants deprived the plaintiffs of a constitutionally protected liberty or property interest; and (2) if so, whether that deprivation occurred without due process of law." *Heck*, 327 F3d at 526. Step two requires the Court to evaluate the *Matthews v. Eldridge* factors, considering

---

[14] The *Hernandez* court likewise did not address whether the actions actually violated the parents' constitutional rights under the first prong of the qualified immunity analysis.

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Heck*, 327 F.3d at 527 (citing *Matthews v. Edridge*, 424 U.S. 319, 335 (1976)).

Both parties recognize that the Fourth Amendment inquiry with respect to the warrantless search, *supra* Part III.A, addresses the same factors that apply to the due process inquiry. Hunt makes no further argument that she is entitled to summary judgment or qualified immunity on the warrantless search procedural due process claim. Thus, the Magistrate Judge recommends that the District Judge **DENY** Hunt's Motion and **GRANT** summary judgment for Breitweiser with respect to the warrantless search.

With respect to the procedural due process claim arising from Hunt delivering the Advisement to Breitweiser's home, Breitweiser has failed to demonstrate that Hunt's action violated a clearly established constitutional right as required to defeat qualified immunity, relying on the same case law held insufficient in the substantive due process context. Accordingly, the Magistrate Judge recommends that the District Judge **GRANT** Hunt's Motion as to any claim arising from Hunt delivering the Advisement.

## IV. Conclusion

Summary judgment is the "'put up or shut up' moment" in litigation, where the parties must come forth with evidence—not mere assertions—to support their claims and defenses. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). Based on the undisputed evidence before the Court, Breitweiser, the nonmovant, has demonstrated that she is entitled to judgment as a matter of law on her Fourth Amendment and procedural due process claims arising out of Hunt's warrantless search of Breitweiser's Apartment. Having

given the parties notice and an opportunity to respond to that prospect [Dkt. 132], the Magistrate Judge recommends that the District Judge **DENY** Hunt's Motion [Dkt. 116] and **GRANT** partial summary judgment in Breitweiser's favor with respect to these claims.

Breitweiser, however, has failed to overcome Hunt's qualified immunity defense with respect to Breitweiser's due process claims for Hunt's alleged threats to remove Breitweiser's children. Accordingly, the Magistrate Judge recommends that the District Judge **GRANT** Hunt's Motion [Dkt. 116] with respect to the remainder of Breitweiser's substantive and procedural due process claims.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Dated:  14 JUN 2017

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Service will be made electronically
on all ECF-registered counsel of record via
email generated by the court's ECF system.